Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

[*additional counsel on signature page*]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>FAT BRANDS INC. SECURITIES LITIGATION | Case No. 2:22-cv-01820-MCS-RAO<br><br>Hon. Mark C. Scarsi<br><br>[Complaint Filed: March 18, 2022]<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

Lead Plaintiff Robert J. Matthews and named plaintiff Michael Melendez ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, allege in this consolidated amended complaint the following upon personal knowledge with respect to their own acts, and upon information and belief as to all other matters based upon, *inter alia*, an investigation

conducted by and through their counsel which included, among other things: review and analysis of relevant filings made by Defendant FAT Brands, Inc. ("FAT Brands" or "Company") with the United States Securities and Exchange Commission ("SEC"); review and analysis of Defendants' public statements, public documents, and wire and press releases about the Company; media and analyst reports and advisories about the Company; interviews with confidential witnesses; information from related court filings; and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities fraud class action on behalf of all persons and entities who purchased publicly traded FAT Brands securities between December 4, 2017 and February 18, 2022, both dates inclusive ("Class," and the time period described is the "Class Period"). On behalf of the Class, Plaintiffs bring claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") for all persons and entities who purchased publicly traded FAT Brands securities during the Class Period at artificially inflated prices and were damaged when the artificial inflation dissipated upon the corrective disclosures.

2. FAT Brands is a public company that purports to generate revenues by acting as a restaurant brand franchisor, collecting franchise fees and ongoing royalty fees from its franchisees, who actually own and operate the restaurants. In the eyes of its CEO, however, FAT Brands has served as a personal piggy bank for him and his family.

3. Unbeknownst to FAT Brands investors, for years, Andrew Wiederhorn used his control over FAT Brands and various other corporate entities to make, and

then forgive, personal loans of tens of millions of dollars to himself, and funded his and his family's lavish lifestyle using corporate funds.

4. Finally, in February 2022, these illicit one-sided transactions caught up to him. On February 19, 2022, an article in the *Los Angeles Times* revealed that both the United States Department of Justice ("DOJ") and the SEC are conducting investigations into allegations of Wiederhorn's misuse of corporate funds, securities fraud, and tax evasion. On February 22, 2022, before trading hours, the Company confirmed that the investigations, which the Company first became aware of in December 2021, concerned the Company's December 2020 merger with Fog Cutter Capital Group Inc. ("FCCG"), as well as transactions between the Company, FCCG, and Mr. Wiederhorn, and compensation, extensions of credit and other benefits or payments received by Wiederhorn or his family.

5. On February 22, 2022, the first trading day following these disclosures, the price of FAT Brands' class A common stock fell by 23%, its class B common stock by 17%, its preferred stock by 30%, and its warrants by 35%, damaging investors.

6. FCCG was a central part of Wiederhorn's scheme. FCCG was owned and controlled by Wiederhorn and had previously been a publicly listed company. NASDAQ delisted FCCG in 2004 after Wiederhorn caused FCCG to enter patently one-sided arrangements to keep him on as CEO and pay him over $4 million upon his guilty plea and while he served a prison sentence for two felonies.

7. During the Class Period, Wiederhorn caused FCCG to loan him tens of millions of dollars at a favorable interest rate of 5%. He then caused FAT Brands to issue intercompany loans to FCCG (the Company's controlling shareholder) to cover the personal loans at an interest rate of 10%. To cover these enormous debts, FAT Brands had to borrow money from outside financiers, at an interest rate of 20%.

8. In 2020, Wiederhorn caused FCCG to forgive approximately $24.4 million of his loan balances without repayment, then he caused FAT Brands and FCCG to merge, dissolving the intercompany loans. The end result: Wiederhorn kept his millions and FAT Brands, and its investors, were left holding the bag.

9. Wiederhorn also used money from FAT Brands to fund his own lavish lifestyle. Between October 2017 and May 2019, Wiederhorn caused FAT Brands to pay for approximately $5 million in personal expenses incurred on Wiederhorn's credit cards. Wiederhorn also coordinate with his son—the Company's COO—Thayer Wiederhorn, to funnel Company funds through Thayer Wiederhorn's PayPal account in "roundtrip" transactions to fraudulently generate millions of credit card reward points for Andrew Wiederhorn's personal benefit, racking up at least $250,000 in fees on the Company's tab.

## JURISDICTION AND VENUE

10. The federal law claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

12. This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) because the alleged misstatements were made in, issued from, or entered this District and the subsequent damages took place in this District. Further, the Company maintains its principal executive offices in Los Angeles County.

14. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15. Lead Plaintiff Robert J. Matthews, as set forth in his certification on file with the Court (ECF No. 22-2) and incorporated by reference herein, purchased the Company's publicly traded securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16. Named Plaintiff Michael Melendez, as set forth in his certification attached hereto as Exhibit A, purchased the Company's publicly traded securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17. Defendant FAT Brands is a Delaware corporation with its principal executive offices at 9720 Wilshire Blvd., Suite 500, Beverly Hills, California 90212. FAT Brands' Class A common stock trades on the NASDAQ exchange under the ticker symbol "FAT," its Class B common stock trades under the ticker symbol "FATBB," its Series B Cumulative Preferred Stock trades under the ticker symbol "FATBP," and its warrants trade under the ticker symbol "FATBW."

18. Defendant Andrew Wiederhorn ("Wiederhorn") has been FAT Brands' President, Chief Executive Officer ("CEO"), and a member of its Board of Directors since the Company's formation. Wiederhorn was also the Chairman, CEO and largest individual shareholder of FCCG at all relevant times. If not otherwise specified, references herein to "Wiederhorn" refer to Andrew Wiederhorn.

19. Defendant Ron Roe ("Roe") was the Company's Chief Financial Officer ("CFO") at the time of the Company's initial public offering on October 20, 2017 ("IPO") through August 16, 2018, when he became the Senior Vice President of Finance for the Company. As CFO, Roe oversaw the Company's financial reporting process. Roe also prepared, reviewed, and authorized the financial statements filed with the SEC, including critical information about the Company's financial health, business operations, and growth prospects.

20. Defendant Rebecca Hershinger ("Hershinger") served as the CFO of the Company from August 2018 through May 2021. As CFO, Hershinger oversaw the Company's financial reporting process. Hershinger also prepared, reviewed, and authorized the financial statements filed with the SEC, including critical information about the Company's financial health, business operations, and growth prospects.

21. Defendant Ken Kuick ("Kuick") has served as the CFO of the Company since May 2021. As CFO, Kuick oversaw the Company's financial reporting process. Kuick also prepared, reviewed, and authorized the financial statements filed with the SEC, including critical information about the Company's financial health, business operations, and growth prospects.

22. Defendant Squire Junger has served as a member of the Company's Board of Directors and a member of the Company's Audit Committee since October 20, 2017.

23. Defendant Silvia Kessel served as a member of the Company's Board of Directors and a member of the Company's Audit Committee from October 20, 2017 until May 7, 2020.

24. Defendant James Neuhauser has served as a member of the Company's Board of Directors and as Chair of the Company's Audit Committee since October 20, 2017.

25. Defendant Edward H. Rensi has served as the Chairman of the FAT Brands Board of Directors since October 20, 2017, and served as a member of the Company's Audit Committee from at least June 9, 2020 through at least December 27, 2020.

26. Defendants Wiederhorn, Roe, Hershinger, Kuick, Junger, Kessel, Neuhauser, and Rensi are sometimes referred to herein as the "Individual Defendants." Defendants Wiederhorn, Roe, Hershinger, and Kuick are sometimes referred to herein as the "Officer Defendants."

27. The Individual Defendants:

(a) directly participated in the management of the Company;

(b) were directly involved in the day-to-day operations of the Company at the highest levels;

(c) were privy to confidential proprietary information concerning the Company and its business and operations;

(d) were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

28. The Company's Board of Directors adopted a charter for the Audit Committee on October 19, 2017, which the Audit Committee reviews and reassesses on an annual basis.

29. The Company's Audit Committee Charter states as follows:

> **<u>III. Duties and Responsibilities</u>**
>
> In fulfilling its purposes as stated in this Charter, the Committee shall undertake the specific duties and responsibilities listed below and such other duties and responsibilities as the Board shall from time to time prescribe, and shall have all powers necessary and proper to fulfill all such duties and responsibilities. Subject to applicable Board and stockholder approvals, the Committee shall:
>
> A. <u>Financial Statement and Disclosure Matters</u>
>
> 1. Review available policies and procedures adopted by the Company to fulfill its responsibilities regarding the fair and accurate presentation of financial statements in accordance with generally accepted accounting principles and applicable rules and regulations of the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) applicable to Nasdaq-listed issuers;
>
> 2. Oversee the Company's accounting and financial reporting processes;
>
> … 6. Confirm that the Company's principal executive officer and principal financial officer are satisfying the certification requirements of Sections 302 and 906 of the Sarbanes-Oxley Act…
>
> D. <u>Matters Regarding Oversight of Compliance Responsibilities</u>
>
> … 3. Review reports prepared by Management concerning all related party transactions for

> potential conflict of interest situations on an ongoing basis and approve all such transactions (if such transactions are not approved by another independent body of the Board);

30. According to the Company's SEC filings, the Company's Audit Committee held seven meetings in 2018, six meetings in 2019, six meetings in 2020, and four meetings in 2021.

31. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

32. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

33. The Company and the Individual Defendants are referred to herein, collectively, as "Defendants."

## **CONFIDENTIAL WITNESSES**

34. Plaintiffs' counsel and investigators spoke with former employees of the Company who have personal knowledge of the facts alleged and attributed to them in this Complaint.

35. Former Employee 1 ("FE1") served as a Brand President and COO of a FAT Brands subsidiary from April 2019 to October 2020. FE1 reported directly to Andrew Wiederhorn, and they were in almost daily communication.

36. FE1 explained that Andrew Wiederhorn kept an extremely tight "inner circle" comprised mostly of his family members: Executive Vice President and Chief Concept Officer Donald Berchtold (Andrew Wiederhorn's father-in-law for thirty years), Chief Operating Officer ("COO") Thayer Wiederhorn (Andrew Wiederhorn's son), Chief Development Officer Taylor Wiederhorn (Andrew

Wiederhorn's son), and Greg Nettleton, the President and COO of the Casual Dining Division and the only non-family member in Wiederhorn's "inner circle." FE1 was the only "C-level" executive who was not related to Andrew Wiederhorn.

37. FE1 also reported that Roe oversaw accounting, loans, expense reimbursements, and related matters, but Andrew Wiederhorn was "a very hands-on CEO" and while "everything from expense reports to loans" went through Roe, "Andy [Wiederhorn] had to sign off on them."

38. Former Employee 2 ("FE2") served as the Executive Assistant to Andrew Wiederhorn from May 2020 to January 2021. FE2 confirmed that Andrew Wiederhorn's inner circle was limited to Berchtold, Wiederhorn's two sons, and Roe.

39. Former Employee 3 ("FE3") served as a high-level Manager within the accounting and finance function of a FAT Brands subsidiary during part of 2021.

40. Shortly after FE3's company was acquired by FAT Brands, FE3 learned that "everything must be run by Andy [Wiederhorn]." FE3 recalled that Wiederhorn insisted on being involved in discussions about minute accounting details which, in FE3's experience, a CEO would normally delegate to others. For example, FE3 explained that Wiederhorn "controlled the release of all wires, ACHs [direct bank transfers], approved all disbursements, etc.," which typically would be handled by the controller or CFO. FE3 explained that "historically, when I've seen someone that is that close to the physical operations of managing and maintaining, whether it be all cash activity generally, it's been because they're trying to keep it out of someone's view."

41. FE3 reported that Wiederhorn "had a really tight grip over the cash. He was more heavily involved than I've historically seen from a CEO perspective. He wanted to know all incoming and outgoing cash. That's how he has his pulse on

the business and he likes to approve all disbursements going out the door. He had a very tight control over cash operations. The best way to think of it – ultimately it seemed as if there was only one person in the business that could make a decision or was empowered to make a decision and that was Andy himself. Everything had to go through Andy." FE3 noted that this manner of operations was not the norm for an organization of FAT Brands' size.

42. FE3 also recalled that the Company "didn't have the staff to support proper SEC reporting." For example, FE3 explained that the core accounting at FAT Brands, including SEC reporting, was handled by "maybe five individuals total, including Ron Roe," which in FE3's experience is insufficient for a company that size.

43. Former Employee 4 ("FE4") served as the Company's Corporate Controller from September 2021 to January 2022. FE4 oversaw the Company's accounting department, and reported directly to Kuick, who reported to Andrew Wiederhorn.

44. FE4 noted that prior to Kuick taking on the CFO role, his predecessor Hershinger "really handled everything in accounting." According to FE4, Kuick and Roe would have been directly involved in any loans or other financial arrangements between the Company and Wiederhorn, or between the Company and FCCG or other affiliates.

## ALLEGATIONS OF SECURITIES FRAUD

### Company Background

45. FAT Brands is a restaurant franchisor. Rather than owning or operating actual restaurant locations, FAT Brands purports to generate revenues primarily by charging its franchisees an initial franchise fee and ongoing royalty fees based on their sales.

46. At the time of its IPO, FAT Brands was the franchisor of two fast casual restaurant brands: Fatburger and Buffalo's Cafe/Buffalo's Express. FAT Brands also disclosed at that time that it intended to acquire Ponderosa Steakhouse and Bonanza Steakhouse.

47. After the IPO, FAT Brands continued to acquire additional restaurant brands, including Round Table Pizza, Marble Slab Creamery, Great American Cookies, Hot Dog on a Stick, Pretzelmaker, Fazoli's, Johnny Rockets, Elevation Burger, Yalla Mediterranean, Hurricane Grill & Wings, Native Grill & Wings, and Twin Peaks.

**Andrew Wiederhorn's History of Misconduct and Self-Dealing**

48. In 2004, Andrew Wiederhorn pleaded guilty to two felony charges in connection with his former company, Wilshire Financial Services Group ("WFSG") and the collapse of Capital Consultants, LLC ("Capital Consultants"). Capital Consultants was an investment advisor which lost approximately $350 million in union pension funds due to fraudulent and failed investments and set off a criminal investigation that led to charges against 11 people. Capital Consultants had loaned $160 million to WFSG before Capital Consultants collapsed in September 2000 and was seized by federal regulators.

49. As a result of the investigation and charges stemming from the Capital Consultants debacle, Wiederhorn pleaded guilty to two felonies: (1) giving an illegal gratuity to Capital Consultants CEO Jeff Grayson, who pleaded guilty to fraud charges; and (2) filing a false tax return. Wiederhorn was sentenced to 18 months in prison and was ordered to pay a $25,000 fine and $2 million in restitution to the Capital Consultants receiver.

50. The day before Wiederhorn entered into the plea deal, he signed an agreement with FCCG—then a public company under Wiederhorn's control—under

which FCCG, while acknowledging the plea agreement and imminent incarceration, nonetheless provided Wiederhorn with approximately $4.75 million in benefits.

51. Wiederhorn's agreement with FCCG stated that, ***while Wiederhorn was in prison for his felony convictions:*** (1) he would retain his titles and responsibilities with FCCG; (2) he would receive his annual salary of $350,000, bonuses, and other benefits; and (3) FCCG would pay Wiederhorn a $2 million "leave of absence payment," matching precisely the amount he was ordered to pay in restitution.

52. The same year that FCCG entered into the deal with Wiederhorn, it reported a net loss of $3.93 million.

53. FCCG had also previously entered into an agreement with Wiederhorn to amend his employment contract in 2003, more than two years *after* it had known about the government investigation of Wiederhorn that led to his eventual guilty plea. Under the provisions of the 2003 amendment, if FCCG terminated Wiederhorn without cause, it would have owed him three times his annual salary, three times his largest annual bonus from the last three years, unreimbursed business expenses, and accrued but unpaid base salary and bonuses – the equivalent of approximately $6 million as of the time of Wiederhorn's guilty plea in June 2004 – all as a lump-sum payment within ten days.

54. Before the 2003 amendment, termination "for cause" included any felony conviction other than a traffic offense. The 2003 amendment changed the relevant provision to limit the definition of a "for cause" termination of Wiederhorn to only a conviction for a felony that involved FCCG.

55. FCCG had been listed on NASDAQ, but in July 2004, NASDAQ delisted FCCG. NASDAQ determined that it was contrary to the public interest for FCCG to remain listed in light of FCCG's patently one-sided agreements with Wiederhorn, FCCG's controlling shareholder and CEO, and because Wiederhorn

was not only exercising substantial influence over the company during his incarceration, but receiving handsome compensation for it.

56. The arrangement Wiederhorn concocted between FCCG and himself prompted New York Times columnist Nicholas Kristof to bestow on Wiederhorn his inaugural "award for greed," writing: "I can't think of a board that has ever so disgraced the principles of corporate governance by overpaying a CEO even as he sits in prison."

**After His Prison Term and FCCG's Delisting,**
**Wiederhorn Turned His Eyes to FAT Brands**

57. In August 2003, FCCG completed a $7 million investment and financing package for Fatburger, acquiring the remainder of the company in 2011. Wiederhorn founded and controlled FCCG as its majority shareholder. He became Fatburger's CEO in 2006 and continued to serve as FCCG's Chairman and CEO, as well as Fatburger's CEO and President.

58. In 2006, after Wiederhorn's appointment as CEO of Fatburger shortly following his release from prison, Fatburger was barred from selling additional franchises in California for several months due to Wiederhorn's felony convictions.

59. In March 2009, after borrowing approximately $3.85 million from financier General Electric Capital Business Asset Funding Corp. ("GE"), several Fatburger subsidiaries owned and operated by FCCG received notices of default and demand for payment from GE.

60. In the end, more than 30 Fatburger subsidiaries, including Fatburger Restaurants of California and Fatburger Restaurants of Nevada, were unable to repay GE and filed for Chapter 11 bankruptcy protection in April 2009. As a result of the bankruptcy proceedings, FCCG was forced to sell off many of its Fatburger restaurants at auction.

61. After the bankruptcy filings, FCCG announced that it had failed to satisfy a listing requirement of the OTC Bulletin Board, where its stock had been listed after being delisted from NASDAQ. FCCG had failed to timely file its financial reports with the SEC, and announced that it expected its stock to no longer be listed on the OTC Bulletin Board. The approximately eight million outstanding shares of FCCG common stock became worthless.

**Wiederhorn Controlled and Looted FAT Brands Through FCCG**

62. FAT Brands was formed as a Delaware corporation on March 21, 2017, for the purposes of completing the IPO, acquiring new brands, and continuing the businesses of Fatburger and Buffalo's Café which were then being conducted as subsidiaries of FCCG. As described in FAT Brands' IPO Prospectus, FCCG, as the controlling shareholder of FAT Brands, "exercised significant influence over corporate management and affairs of FAT Brands" and "controlled virtually all [FAT Brands] matters requiring stockholder approval."

63. Prior to FAT Brands' IPO, FCCG owned 100% of FAT Brands' common stock and voting power. Following the IPO, FCCG retained 80% of FAT Brands' common stock and voting power.

64. FAT Brands continued to issue similar warnings about FCCG's significant and potentially conflicting influence through at least April 2020:

> FCCG controls approximately 80% of the combined voting power of our Common Stock and will, for the foreseeable future, have significant influence over corporate management and affairs and be able to control virtually all matters requiring stockholder approval. FCCG is able to, subject to applicable law, elect a majority of the members of our Board of Directors and control actions to be taken by us, including amendments to our certificate of incorporation and bylaws and approval of significant corporate transactions, including mergers and sales of substantially all of our assets. It is possible that the

> interests of FCCG may in some circumstances conflict with our interests and the interests of our other stockholders.

65. At the time of the IPO, Wiederhorn was serving as President, CEO, and director of FAT Brands as well as the Chairman and CEO of FCCG. Roe, then the Senior Vice President and CFO of FAT Brands, also served as CFO of FCCG at the time of the IPO.

66. Wiederhorn began working for Berchtold when Wiederhorn was just 13 years old, later marrying Berchtold's daughter. Berchtold served as both President and COO of Fatburger as well as President and COO of FCCG. Berchtold served as Senior Vice President of WFSG, which Wiederhorn founded. Wiederhorn also served as the Chairman, CEO, Secretary, and Treasurer for WFSG. Berchtold also served as FCCG's CEO during Wiederhorn's imprisonment.

67. Wiederhorn, through FCCG, planned to conduct FAT Brands' IPO as a Regulation A+, or "Reg A+," offering. Under Title IV of the 2015 Jumpstart Our Business Startups (JOBS) Act, a private company can raise public funding through a Reg A+ offering, which involves an expedited review process. In a Reg A+ offering, a company is required to make its offering memorandum public just 21 days prior to SEC qualification.

68. In light of Wiederhorn's felonies and prison sentence and FCCG's two prior delistings, Wiederhorn and FCCG opted to pursue a Reg A+ offering in lieu of a traditional IPO to avoid the heightened scrutiny that a traditional IPO would entail.

69. In its IPO, FAT Brands sold two million shares of its common stock to investors for $12 per share, raising $24 million in gross proceeds. FCCG retained its eight million shares and thus 80% of the voting power of FAT Brands.

70. FCCG also "contributed" its two operating subsidiaries, Fatburger and Buffalo's Café, to the Company in connection with the IPO, in exchange for a $30

million promissory note. According to the Offering Circular, the Company planned to use $10.55 million of the IPO proceeds to purchase Ponderosa and Bonanza, and to send $9.5 million of the proceeds to FCCG to partially repay the $30 million debt. After the repayment of the $9.5 million to FCCG, FAT Brands would assume a $20.5 million debt obligation to FCCG, which would carry a 10% interest rate and mature five years following the IPO.

71. The FAT Brands IPO created a liquid market through which FCCG could monetize and sell its substantial stock holdings in FAT Brands. FCCG was also entitled to the lion's share of dividends paid by FAT Brands.

72. For completing the FAT Brands IPO, Wiederhorn received a bonus of $400,000 in cash and 15,000 shares of FAT Brands common stock (which became liquid and assumed a market value of $180,000 upon the IPO), and Roe received a bonus of $300,000 cash and 15,000 shares of FAT Brands common stock.

**After FAT Brands' IPO, Wiederhorn Used**
**<u>FAT Brands as his Personal Piggy Bank</u>**

73. On June 15, 2021, two FAT Brands shareholders filed a derivative shareholder action against Andrew Wiederhorn and the other members of FAT Brands' board of directors. *Harris v. Junger*, No. 2021-0511-SG (Del. Ch.).

74. The *Harris* complaint was filed after the shareholders had reviewed internal company records pursuant to their books and records demand under §220 of the Delaware General Corporation Law. The *Harris* plaintiffs brought claims for breach of fiduciary duty, unjust enrichment, and waste of corporate assets against Wiederhorn and the other defendants. On February 11, 2022, Judge Glasscock denied the defendants' motion to dismiss the *Harris* complaint.

75. As detailed in the *Harris* complaint, in addition to using FCCG to control FAT Brands, Wiederhorn also used FCCG and FAT Brands as his personal piggy bank.

76. According to the *Harris* complaint, aside from its controlling stake in FAT Brands, FCCG held nothing of material value apart from net operating loss carryforwards ("NOLs") following the FAT Brands IPO. Those NOLs were essentially worthless because FCCG (and FAT Brands, after its subsequent merger with FCCG) had no real earnings to be taxed, and thus no taxes for the NOLs to offset. Moreover, the Company already had access to FCCG's NOLs, subject to payments under an existing tax sharing agreement between the companies, so long as FCCG owned at least 80% of the Company. FAT Brands would only be unable to use the FCCG NOLs if FCCG decided to dilute or sell off its own holdings.

77. According to the *Harris* complaint, despite FCCG's near total lack of cash flow, Wiederhorn caused FCCG to repeatedly make cash advances to Wiederhorn in the form of personal loans at a 5% interest rate. As of December 29, 2019 and December 30, 2018, the outstanding balances on FCCG's loans to Wiederhorn were $16,803,000 and $9,155,000, respectively.

78. According to the *Harris* complaint, FCCG had no other assets or cash flow, so it had to borrow from FAT Brands to fund its loans to Wiederhorn. FAT Brands extended credit to FCCG pursuant to an Intercompany Promissory Note dated October 20, 2017, with an initial principal balance of $11,906,000. FCCG and certain of its subsidiaries received additional intercompany loans from FAT Brands in the aggregate amount of $10,523,000.

79. In April 2020, FAT Brands entered into a five-year revolving credit agreement with FCCG, with a maximum capacity of $35 million and an interest rate of 10%. The initial balance of the credit agreement was just over $21 million, including the balance of notes between the Company and FCCG, accrued and unpaid interest income, and other adjustments through December 29, 2019. As of March 29, 2020, the balance receivable under the credit agreement was nearly $27 million.

80. As the *Harris* complaint alleges, there never was a business justification for these loans. As of December 29, 2019, FCCG had total liabilities and stockholders' deficit of $32.9 million, an annual net loss of $6.2 million, and essentially no source of potential revenue apart from its holdings in FAT Brands. In fact, FCCG appears to have had no business operations, apart from its holdings in FAT Brands, since some time in 2018.

81. According to the *Harris* complaint, as a result of these loans, FAT Brands was forced to enter into an expensive financing agreement with The Lion Fund, under which the Company borrowed $20 million when it ran short of cash in 2019. The interest rate on that loan was 20% and the Company had to give The Lion Fund a lien on substantially all of its assets. Thus, the Company was effectively loaning tens of millions of dollars to Wiederhorn (through FCCG) at a 10% interest rate, but borrowing the funds at 20%, while Wiederhorn paid only 5%.

82. Wiederhorn then caused FCCG and FAT Brands to propose a merger in late 2020. Through the proposed merger transaction, the FAT Brands stock held by FCCG would be cancelled, FCCG stockholders would be issued FAT Brands common stock in the amount previously held by FCCG, and non-FCCG stockholders of FAT Brands (including the Company's directors) would receive a special dividend of FAT Brands preferred stock.

83. In order to consolidate his control over FAT Brands and avoid dilution from the merger, on September 2, 2020, Wiederhorn caused FCCG to effectuate a 326,000-to-1 reverse stock split. FCCG stockholders owning less than one share after the reverse split were issued notes in lieu of their fractional share in the amount of $2.75 per original share. Immediately following the reverse stock split, FCCG then declared a 1-to-326,000 stock split, undoing the effects of the reverse stock split save for the elimination of smaller shareholders, and leaving Wiederhorn and his affiliates in complete control of FCCG.

84. The FAT Brands-FCCG merger was consummated on December 24, 2020 without a vote of the unaffiliated FAT Brands shareholders.

85. In the first nine months of 2020, Wiederhorn caused FCCG to forgive approximately $16.9 million of his debts to FCCG without payment, leaving a balance of approximately $5.6 million.

86. After the September 2, 2020 reverse stock split, Wiederhorn then caused FCCG to transfer a package of FAT Brands preferred stock and warrants, with a combined carrying value of $1,861,000, to a holding company owned primarily by Wiederhorn, adding that amount to Wiederhorn's debt and bringing his total outstanding loan balance to approximately $7.5 million.

87. Immediately prior to FCCG's merger with FAT Brands, Wiederhorn caused FCCG to forgive the entire balance of his debts to FCCG without payment. At that point, going into the merger, FCCG owed FAT Brands nearly $40 million through intercompany loans.

88. In sum, Wiederhorn caused FCCG to loan him tens of millions of dollars, and then caused FAT Brands to loan the money to FCCG to cover those debts. He then caused FCCG to forgive his personal loans without any repayment, and then caused the merger of FAT Brands and FCCG to dissolve the intercompany loans. Wiederhorn walked away from the transactions with millions in his pockets and consolidated control over the Company, and the Company and its shareholders were left holding the bag.

89. According to the *Harris* complaint, the Merger left the Company hugely indebted, with nearly $100 million in debt (including operating leases). In addition, it had close to $20 million in negative working capital (a large portion of which is essentially a form of debt) and a business with negative earnings, negative cash flow, and barely enough EBITDA to meet the Company's enormous interest

expenses (and not enough to pay the interest on its debt and also pay the preferred stock dividend obligations).

90. Thus, the merger left the Company on the brink of insolvency and wiped out substantially all of the Company's equity value. As a result, the Company's auditors issued a "going concern" qualification in the Company's annual report for 2020.

91. Wiederhorn also treated FAT Brands as an employment service for himself and his extended family. For example:

- Andrew Wiederhorn served as the Company's President, CEO, and a director. In 2021, the Company paid Andrew Wiederhorn total compensation of $2,874,909;

- Donald Berchtold served as the Company's Executive Vice President and Chief Concept Officer, earning a salary of $400,000 in 2020;

- Thayer Wiederhorn, Andrew Wiederhorn's son, has served as the Company's COO since November 2021 and served as the Company's Chief Marketing Officer since March 2017. During fiscal year 2020, Thayer Wiederhorn received total cash compensation from the Company of approximately $300,000. During fiscal year 2021, Thayer Wiederhorn received total cash compensation from the Company of approximately $1,080,000;

- Taylor Wiederhorn, also Andrew Wiederhorn's son, has served as the Company's Chief Development Officer since October 2017. During fiscal year 2020, Taylor Wiederhorn received total cash compensation from the Company of approximately $300,000. During fiscal year 2021, Taylor Wiederhorn received total cash compensation from the Company of approximately $960,000.

- Mason Wiederhorn, also Andrew Wiederhorn's son, served as the Company's Creative Director. During fiscal year 2020, Thayer Wiederhorn received total cash compensation from the Company of approximately $250,000. During fiscal year 2021, Mason Wiederhorn received total cash compensation from the Company of approximately $740,000;

- Madison Wiederhorn, Andrew Wiederhorn's daughter, also worked for the Company as an Associate Director of New Store Development.

- Jacob Berchtold, son of Donald Berchtold (and Andrew Wiederhorn's former brother-in-law), served as COO of the Company's Fast Casual Division. During fiscal year 2020, Jacob Berchtold received total cash compensation from the Company of approximately $250,000.

92. All told, members of the Wiederhorn/Berchtold family with titles starting with the word "Chief" or "Director" took home at least $1.8 million of yearly compensation in 2020, and in 2021 that figure was at least $5.6 million.

93. In 2020, the Company reported a net loss of $14.9 million. In 2021, the Company reported a net loss of $31.6 million.

## **Defendants Made False and Misleading Statements and Omissions of Material Fact During the Class Period**

94. On December 4, 2017, FAT Brands filed with the SEC its quarterly report for the third quarter of 2017 on Form 10-Q ("3Q17 Report"), which was signed by Wiederhorn and Roe.

95. On April 2, 2018, FAT Brands filed with the SEC its 2017 annual report on Form 10-K ("2017 Annual Report"), which was signed by Wiederhorn, Roe, Rensi, Junger, Kessel, and Neuhauser.

96. On May 16, 2018, FAT Brands filed with the SEC its quarterly report for the first quarter of 2018 on Form 10-Q ("1Q18 Report"), which was signed by Wiederhorn and Roe.

97. On August 15, 2018, FAT Brands filed with the SEC its quarterly report for the second quarter of 2018 on Form 10-Q ("2Q18 Report"), which was signed by Wiederhorn and Roe.

98. On November 14, 2018, FAT Brands filed with the SEC its quarterly report for the third quarter of 2018 on Form 10-Q ("3Q18 Report"), which was signed by Wiederhorn and Hershinger.

99. On March 29, 2019, FAT Brands filed with the SEC its 2018 annual report on Form 10-K ("2018 Annual Report"), which was signed by Wiederhorn, Hershinger, Rensi, Junger, Kessel, and Neuhauser.

100. On May 14, 2019, FAT Brands filed with the SEC its quarterly report for the first quarter of 2019 on Form 10-Q ("1Q19 Report"), which was signed by Wiederhorn and Hershinger.

101. On August 14, 2019, FAT Brands filed with the SEC its quarterly report for the second quarter of 2019 on Form 10-Q ("2Q19 Report"), which was signed by Wiederhorn and Hershinger.

102. On November 8, 2019, FAT Brands filed with the SEC its quarterly report for the third quarter of 2019 on Form 10-Q ("3Q19 Report"), which was signed by Wiederhorn and Hershinger.

103. On April 28, 2020, FAT Brands filed with the SEC its 2019 annual report on Form 10-K ("2019 Annual Report"), which was signed by Wiederhorn, Hershinger, Rensi, Junger, Kessel, and Neuhasuer.

104. On May 29, 2020, FAT Brands filed with the SEC its quarterly report for the first quarter of 2020 on Form 10-Q ("1Q20 Report"), which was signed by Wiederhorn and Hershinger.

105. On August 7, 2020, FAT Brands filed with the SEC its quarterly report for the second quarter of 2020 on Form 10-Q ("2Q20 Report"), which was signed by Wiederhorn and Hershinger.

106. On November 12, 2020, FAT Brands filed with the SEC its quarterly report for the third quarter of 2020 on Form 10-Q ("3Q20 Report"), which was signed by Wiederhorn and Hershinger.

107. On March 29, 2021, FAT Brands filed with the SEC its 2020 annual report on Form 10-K ("2020 Annual Report") which was signed by Wiederhorn, Hershinger, Rensi, Junger, and Neuhauser.

108. On May 12, 2021, FAT Brands filed with the SEC its quarterly report for the first quarter of 2021 on Form 10-Q ("1Q21 Report"), which was signed by Wiederhorn and Hershinger.

109. On August 6, 2021, FAT Brands filed with the SEC its quarterly report for the second quarter of 2021 on Form 10-Q ("2Q21 Report"), which was signed by Kuick.

110. On November 8, 2021, FAT Brands filed with the SEC its quarterly report for the third quarter of 2021 on Form 10-Q ("3Q21 Report"), which was signed by Kuick.

111. The 3Q17 Report stated the following regarding the Company's debt, loans, and financing activities related to Wiederhorn:

> … On June 21, 2017, the debt was purchased by a limited partnership in which Andrew Wiederhorn, the CEO of the Company, is a general partner. Fog Cutter Capital Group Inc. has agreed to indemnify FAT Brands Inc. and Subsidiaries from costs and liabilities which may arise from this matter.

112. This statement was false and misleading because Defendants knew or recklessly disregarded, but omitted, in violation of their duty to disclose, material

facts about the Company's debts and related transactions with Wiederhorn, including that: (1) Andrew Wiederhorn devised and executed an ongoing fraudulent scheme to receive millions of dollars in sham loans through FAT Brands and FCCG; (2) Andrew Wiederhorn and his son, Thayer, misused corporate funds in "roundtrip" transactions to fraudulently generate credit card rewards points for Andrew Wiederhorn's personal benefit; and (3) none of these actions were carried out for any legitimate corporate purpose.

113. The following statement, or one substantially similar to it, was contained in the 3Q17 Report, 2017 Annual Report, 2018 Annual Report, 2019 Annual Report, and 2020 Annual Report, touting the leadership and experience of the Company's executive management personnel and Wiederhorn in particular:

> ***We depend on the leadership and experience of our relatively small number of key executive management personnel, and in particular key executive management, particularly our Chief Executive Officer, Andrew Wiederhorn. The loss of the services of any of our executive management members could have a material adverse effect on our business and prospects***, as we may not be able to find suitable individuals to replace such personnel on a timely basis or without incurring increased costs, or at all.
>
> (Emphasis added).

114. These statements were false and misleading because Defendants knew, or recklessly disregarded, but omitted, in violation of their duty to disclose, material facts about the leadership and experience of the Company's CEO, Andrew Wiederhorn, and the risks of losing his services, that contradicted this depiction. Specifically, Defendants failed to disclose that: (1) Andrew Wiederhorn devised and executed an ongoing fraudulent scheme to receive millions of dollars in sham loans through FAT Brands and FCCG; (2) Andrew Wiederhorn caused FAT Brands to pay

for at least $5 million of personal expenses for him and his family, including between October 2017 and May 2019; (3) Andrew Wiederhorn and his son, Thayer, misused corporate funds in "roundtrip" transactions to fraudulently generate credit card rewards points for Andrew Wiederhorn's personal benefit; and (4) none of these actions were carried out for any legitimate corporate purpose.

115. The following statement, or one substantially similar to it, was contained in the 3Q17 Report, 2017 Annual Report, 2018 Annual Report, 2019 Annual Report, and 2020 Annual Report, touting the Company's competitive strengths:

> We believe that our competitive strengths include:
>
> … *Seasoned and Passionate Management Team*. Our management team and employees are critical to our success. Our senior leadership team has more than 200 years of combined experience in the restaurant industry, and many have been a part of our team since the acquisition of the Fatburger brand in 2003. ***We believe that our management team has the track record and vision to leverage the FAT Brands platform to achieve significant future growth. In addition, through their holdings in FCCG, our senior executives own a significant equity interest in the company, ensuring long-term commitment and alignment with our public shareholders.*** Our management team is complemented by an accomplished Board of Directors.
>
> (Emphasis added).

116. These statements were false and misleading because Defendants knew, or recklessly disregarded, but omitted, in violation of their duty to disclose, material facts that contradicted this positive portrayal of the "track record" of its management team, specifically Andrew Wiederhorn, and these material facts belied his

"alignment with [the Company's] public shareholders." In particular, Defendants failed to disclose that: (1) Andrew Wiederhorn devised and executed an ongoing fraudulent scheme to receive millions of dollars in sham loans through FAT Brands and FCCG; (2) Andrew Wiederhorn caused FAT Brands to pay for at least $5 million of personal expenses for him and his family, including between October 2017 and May 2019; (3) Andrew Wiederhorn and his son, Thayer, misused corporate funds in "roundtrip" transactions to fraudulently generate credit card rewards points for Andrew Wiederhorn's personal benefit; and (4) none of these actions were carried out for any legitimate corporate purpose.

117. Each of the 3Q17 Report, 2017 Annual Report, 1Q18 Report, 2Q18 Report, 3Q18 Report, 2018 Annual Report, 1Q18 Report, 2Q18 Report, 3Q18 Report, 2019 Annual Report, 1Q19 Report, 2Q19 Report, 3Q19 Report, 2020 Annual Report, 1Q21 Report, 2Q21 Report, and 3Q21 Report either (A) identified related party transactions other than the Company's payments of millions of dollars to Wiederhorn for his personal credit card expenses and Andrew and Thayer Wiederhorn's use of Company funds in "roundtrip" transactions to generate credit card reward points for Wiederhorn, or (B) stated that "there were no reportable related party transactions" in the relevant period. In addition, the following statement, or one substantially similar to it, was contained in each of the 2017 Annual Report, 2018 Annual Report, 2019 Annual Report, and 2020 Annual Report, regarding the Company's related party transactions:

> Other than the transactions described elsewhere in this Annual Report on Form 10-K between the Company and FCCG, since January 1, 2017 [or 2018, 2019, 2020, respectively], there has not been, nor is there currently proposed, any transaction or series of similar transactions to which we were or will be a party:

- in which the amount involved exceeds $120,000; and
- in which any director, executive officer, shareholder who beneficially owns 5% or more of our common stock or any member of their immediate family had or will have a direct or indirect material interest.

118. These statements were false and misleading because Defendants knew, or recklessly disregarded, but omitted, in violation of their duty to disclose, material related party transactions in that: (1) FAT Brands covered at least $5 million of personal credit card expenses for Andrew Wiederhorn and his family, including between October 2017 and May 2019; and (2) Andrew Wiederhorn and his son, Thayer, used corporate funds in "roundtrip" transactions to fraudulently generate credit card rewards points for Andrew Wiederhorn's personal benefit.

119. The 2018 Annual Report and 2019 Annual Report each stated that "our Chief Executive Officer and Chief Financial Officer concluded that our internal control over financial reporting was effective as of December 30, 2018 [or December 29, 2019, respectively]."

120. These statements were false and misleading because, as Defendants knew or recklessly disregarded, the Company's internal control over financial reporting was not effective during the relevant time periods. Defendants knew, or recklessly disregarded, but failed to disclose that the Company's internal control over financial reporting had material weaknesses, including the Company's inability to identify and prevent fraudulent self-dealing transactions such as those Wiederhorn carried out, or to accurately report material related party transactions, such as those between the Company and Andrew and Thayer Wiederhorn.

121. The 2020 Annual Report also stated the following regarding the Company's internal control over financial reporting:

> … our Chief Executive Officer and Chief Financial Officer concluded that our internal control over financial reporting was not effective as of December 27, 2020 and have identified the following material weaknesses in the Company's internal control over financial reporting:
>
> *Segregation of duties*: We are classified as a smaller reporting company and an emerging growth company. As such, we have a small accounting staff that reviews and processes all transactions within our accounting systems. Each member of the staff has access rights to the accounting system that extend beyond his / her specific job function. Accordingly, we are not able to segregate duties to the extent we could if we had more people to establish a preventative control. While we have taken steps to mitigate this risk through detective controls, these steps have not been adequately documented to deem the material weakness to be fully remediated.
>
> *Financial Close Process*: As outlined above, we are a smaller reporting company and emerging growth company that has experienced rapid growth over the past two years. Combined with a small accounting staff, we have not effectively implemented or documented our financial close process in order to provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements without error. While management regularly reviews the many accounting transaction cycles on an aggregated basis to ensure reasonableness, detailed review controls have not been adequately implemented and documented to establish an effective detective control to deem the material weakness to be fully remediated.

122. These statements were false and misleading because, as Defendants knew or recklessly disregarded, the Company's internal control over financial reporting was not effective as of as of December 27, 2020 due to additional

undisclosed material weaknesses, including the Company's inability to identify and prevent fraudulent self-dealing transactions such as those Wiederhorn carried out, or to accurately report material related party transactions, such as those between the Company and Andrew and Thayer Wiederhorn.

123. The 2017 Annual Report also stated the following under the heading, "ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE":

> **Review and Approval of Related Person Transactions**
>
> We have adopted, by resolution of our Board of Directors, a policy that any transactions between us and any of our affiliates or related parties, including our executive officers, directors, shareholders who own 5% or more of our common stock, the family members of those individuals and any of their affiliates, must (1) be approved by a majority of the members of the Board of Directors and by a majority of the disinterested members of the Board of Directors and (2) be on terms no less favorable to us than could be obtained from unaffiliated third parties.

124. This statement was false and misleading because Defendants knew, or recklessly disregarded, but omitted, in violation of their duty to disclose, that the Company either did not adopt or did not implement the policy described. This is evidenced by the undisclosed material related party transactions whereby: (1) FAT Brands covered at least $5 million of personal credit card expenses for Andrew Wiederhorn and his family, including between October 2017 and May 2019; and (2) Andrew Wiederhorn and his son, Thayer, used corporate funds in "roundtrip" transactions to fraudulently generate credit card rewards points for Andrew Wiederhorn's personal benefit. None of these transactions were "on terms no less favorable to [the Company] than could be obtained from unaffiliated third parties."

125. Attached to the Company's annual and quarterly reports referenced above were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Wiederhorn and Roe (3Q17 Report, 2017 Annual Report, 1Q18 Report, and 2Q18 Report), Wiederhorn and Hershinger (3Q18 Report, 2018 Annual Report, 1Q18 Report, 2Q18 Report, 3Q18 Report, 2019 Annual Report, 1Q19 Report, 2Q19 Report, 3Q19 Report, 2020 Annual Report, and 1Q21 Report), or Wiederhorn and Kuick (2Q21 Report and 3Q21 Report), attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

126. Specifically, each of the SOX certifications stated that the respective report to which they were attached (1) "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; and (2) that the respective signors had disclosed to the Company's auditors and audit committee "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the [Company's] internal control over financial reporting."

127. These statements were false because, as Defendants knew or recklessly disregarded: (1) each of the reports did contain omissions of material fact that rendered certain of its statements misleading, as identified above; and (2) the respective signors had not disclosed Wiederhorn's fraudulent schemes to the Company's auditors and audit committee.

128. On January 10, 2022, the Company filed with the SEC a current report on Form 8-K, which was signed by Kuick, attaching an investor presentation ("Investor Presentation"). The Investor Presentation touted the Company's management, including Andrew and Thayer Wiederhorn, in the following slides:




* * *

## EXPERIENCED MANAGEMENT TEAM

**Management Team**

**Andrew Wiederhorn | President, CEO & Director**
Fog Cutter Capital, Founder of FAT Brands

**Ken J. Kuick | Chief Financial Officer**
Noodles & Company, VICI Properties, Caesars Entertainment

**Thayer Wiederhorn | Chief Operating Officer**
10+ years w/ Fog Cutter Capital and Fatburger

**Rob Rosen | EVP Capital Markets**
Kodiak Financial Group, Black Diamond Capital Management

**Allen Z. Sussman | EVP & General Counsel**
Partner Loeb & Loeb LLP

**Taylor Wiederhorn | Chief Development Officer**
10+ years w/ Fog Cutter Capital and Fatburger

**Jenn Johnston | President QSR Division**
Global Franchise Group, NexCen Franchise Management

**Carl Howard | President & CEO Fazoli's**
Fazoli's, Damon's Int'l, bd's Mongolian Barbeque

**Joe Hummel | CEO Twin Peaks**
Twin Peaks, La Cima Restaurants, Hooters, Naturally Fresh

**Jacob Berchtold | President & COO Fast Casual Division**
15+ years w/ Fatburger

**Gregg Nettleton | President & COO Casual Dining Division**
GBS Enterprises, Black Angus Steakhouses, IHOP

**Ron Roe | SVP Finance**
Fog Cutter Capital, Piper Jaffray

**Mason Wiederhorn | Chief Brand Officer**
10+ years w/ Fog Cutter Capital and Fatburger

**Justin Nedelman | Chief Real Estate Officer**
Eureka! Restaurant Group, Fillmore Street Investments LP

**Raphael Tomlin | Chief Supply Chain Officer QSR Division**
Global Franchise Group, Country Home Bakers, Mission Foods

**Don Berchtold | EVP & Chief Concept Officer**
20+ years w/ Fog Cutter Capital

**Warren Christiansen | Legal Counsel & Director of Franchise Development**
10+ years w/ Fog Cutter Capital

**Board of Directors**

**Edward Rensi | Chairman of the Board**
Former President & CEO McDonald's USA, CEO Famous Dave's of America

**James Neuhauser, CFA | Director & Chair of Audit Committee**
Stifel Nicolas & Co, Turtlerock Capital, Exec Committee FBR & Co, Trident Financial, Bank of New England

**Amy V. Forrestal | Director**
Brookwood Associates, NationsBanc Montgomery Securities, Bank of America Securities

**Squire Junger, CPA | Director**
Co-Founder Insight Consulting, Former Partner Arthur Anderson

**Kenneth J. Anderson | Director**
Cedar Tree Capital, Aspiriant, Co-Founder of Quintile Wealth Management, Arthur Anderson

**Andrew Wiederhorn | President, CEO & Director**
Fog Cutter Capital, Founder of FAT Brands

FRESH. AUTHENTIC. TASTY. 14

129. These statements were false and misleading because Defendants knew, or recklessly disregarded, but omitted, in violation of their duty to disclose, material

facts about the "expertise" and "experience[]" of the Company's management team, specifically its CEO, Andrew Wiederhorn, and its COO, Thayer Wiederhorn, that contradicted this depiction. Specifically, Defendants failed to disclose that: (1) Andrew Wiederhorn devised and executed an ongoing fraudulent scheme to receive millions of dollars in sham loans through FAT Brands and FCCG; (2) Andrew Wiederhorn caused FAT Brands to pay for at least $5 million of personal expenses for him and his family, including between October 2017 and May 2019; (3) Andrew Wiederhorn and his son, Thayer, misused corporate funds in "roundtrip" transactions to fraudulently generate credit card rewards points for Andrew Wiederhorn's personal benefit; and (4) none of these actions were carried out for any legitimate corporate purpose.

**<u>Defendants Made False and Misleading Omissions and Violated GAAP by Failing to Disclose Material Related Party Transactions</u>**

130. Defendants had a duty to disclose the material related party transactions that the Company engaged in by making millions of dollars in payments to Wiederhorn to cover credit card purchases made for Wiederhorn's and his family's personal benefit, and by "round-tripping" Company funds and incurring transaction fees through accounts owned by Thayer Wiederhorn for the purpose of fraudulently generating millions of credit card rewards points for Andrew Wiederhorn's personal benefit. Defendants violated their duty when they failed to disclose those transactions, rendering their statements false and misleading.

131. Defendants' duty to disclose the related party transactions arose out of two independent bases: under Item 404(a) of the SEC's Regulation S-K, and under U.S. Generally Accepted Accounting Principles ("GAAP").

***<u>Defendants Violated Their Duty to Disclose Under Item 404(a)</u>***

132. Item 404(a) of Regulation S-K (17 C.F.R. § 229.404) requires the disclosure of "any transaction, since the beginning of the registrant's last fiscal year,

or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

133. Item 404(a) requires the disclosure of (a) the name of the related party and the basis of the relation; (b) the related party's interest in the transaction, including the related party's relationship with an entity that is a party to, or has an interest in, the transaction; (c) the approximate dollar value of the transaction; (d) the approximate dollar value of the related party's interest in the transaction; and (e) any other material information regarding the transaction or the related party in light of the circumstances of the transaction.

134. The Instructions to Item 404(a) define the term "related person" to include: "[a]ny director or executive officer of the registrant" and "[a]ny immediate family member of a director or executive officer … which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law."

135. Andrew and Thayer Wiederhorn were related parties of FAT Brands under Item 404(a) as FAT Brands' executive officers and/or immediate family members of FAT Brands' executives officers, and both, or at least Andrew Wiederhorn, had a direct material interest in the transactions.

136. The Company's transactions with Andrew and Thayer Wiederhorn were over $120,000, as they comprised approximately $5 million in Andrew Wiederhorn's credit card purchases between October 2017 and May 2019, and approximately $9 million in Company funds that were "round-tripped" through Thayer Wiederhorn's accounts, costing the Company approximately $250,000 in fees to PayPal.

137. Each of the 3Q17 Report, 2017 Annual Report, 1Q18 Report, 2Q18 Report, 3Q18 Report, 2018 Annual Report, 1Q18 Report, 2Q18 Report, 3Q18

Report, 2019 Annual Report, 1Q19 Report, 2Q19 Report, 3Q19 Report, 2020 Annual Report, 1Q21 Report, 2Q21 Report, and 3Q21 Report were misleading because Andrew and Thayer Wiederhorn were related parties to FAT Brands and, in accordance with Item 404(a), FAT Brands was required to, but did not, disclose its material transactions with Andrew and Thayer Wiederhorn including (a) the name of the related party and the basis of the relation; (b) the related party's interest in the transaction, including the related party's relationship with an entity that is a party to, or has an interest in, the transaction; (c) the approximate dollar value of the transaction; (d) the approximate dollar value of the related party's interest in the transaction; and (e) any other material information regarding the transaction or the related party in light of the circumstances of the transaction.

### ***Defendants Violated Their Duty to Disclose Under GAAP***

138. GAAP also required the Company to disclose all material related party transactions.

139. GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

140. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). FASB maintains the Accounting Standards Codification ("ASC"), which is the authoritative source of GAAP in US accounting practices.

141. SEC, NYSE, and NASDAQ rules and regulations require that publicly traded companies such as FAT Brands include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X.

142. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

143. Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants Professional Standards, vol. 1, AU § 110.03 (1998), provides as follows:

> The financial statements are management's responsibility … Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. … Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

144. ASC 850, Related Parties, provides that a public company's "[f]inancial statements shall include disclosures of material related party transactions." ASC 850-10-50-1.

145. "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families." ASC 850-10-50-3.

146. Disclosures of related party transactions shall include: (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the

dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

147. Andrew and Thayer Wiederhorn were related parties of FAT Brands as they were executive officers (*i.e.*, management) of the Company, and/or members of the immediate families of the Company's management. ASC 850-10-50-3.

148. The Company's transactions with Andrew and Thayer Wiederhorn were material, as they comprised approximately $5 million in Andrew Wiederhorn's credit card purchases between October 2017 and May 2019, and approximately $9 million in Company funds that were "round-tripped" through Thayer Wiederhorn's accounts, costing the Company approximately $250,000 in fees to PayPal. The Company suffered annual net losses of approximately $613,000 in 2017, $1.8 million in 2018, $1.0 million in 2019, $14.9 million in 2020, and $31.6 million in 2021. Thus, the approximately $14 million that Wiederhorn misused ($9 million) or misappropriated ($5 million) amounted to approximately 28% of the Company's net losses over a five-year span during the Class Period.

149. Each of the 3Q17 Report, 2017 Annual Report, 1Q18 Report, 2Q18 Report, 3Q18 Report, 2018 Annual Report, 1Q18 Report, 2Q18 Report, 3Q18 Report, 2019 Annual Report, 1Q19 Report, 2Q19 Report, 3Q19 Report, 2020 Annual Report, 1Q21 Report, 2Q21 Report, and 3Q21 Report contained financial statements for FAT Brands that purported to be presented "in conformity with accounting principles generally accepted in the United States of America" (*i.e.*, GAAP).

150. Each of the 3Q17 Report, 2017 Annual Report, 1Q18 Report, 2Q18 Report, 3Q18 Report, 2018 Annual Report, 1Q18 Report, 2Q18 Report, 3Q18 Report, 2019 Annual Report, 1Q19 Report, 2Q19 Report, 3Q19 Report, 2020

Annual Report, 1Q21 Report, 2Q21 Report, and 3Q21 Report were materially false and misleading because they violated GAAP, in that Andrew and Thayer Wiederhorn were related parties to FAT Brands and, in accordance with GAAP, FAT Brands was required to, but did not, disclose its material transactions with Andrew and Thayer Wiederhorn including (a) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (b) the dollar amount of transactions for each of the periods for which income statements are presented, and (c) amounts due from or to the companies as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. See ASC 850-10-50-1.

## An *LA Times* Article Reveals Wiederhorn's Undisclosed Misconduct and the Falsity of Defendants' Statements

151. On Saturday, February 19, 2022, the *Los Angeles Times* published an article by Pulitzer Prize-winning reporter Matt Hamilton entitled "Family behind Fatburger under investigation for alleged fraud, money laundering, records show" ("*LA Times* Article"). A copy of the *LA Times* Article is attached hereto as Exhibit B. The *LA Times* Article stated the following, in pertinent part:

> Federal authorities have been investigating Andrew Wiederhorn, chief executive of the company that owns the Fatburger and Johnny Rockets restaurant chains, and examining one of his family member's actions as part of an inquiry into allegations of securities and wire fraud, money laundering and attempted tax evasion, court records show.
>
> ***During the probe, federal agents in December raided the Beverly Grove home of Wiederhorn's son Thayer and daughter-in-law Brooke Wiederhorn, according to search warrant records filed in court.***

* * *

Agents hauled away phones, digital storage devices, tax documents and other records from the couple's residence, according to court filings.

***Federal investigators also sought a judge's permission to search the elder Wiederhorn's Beverly Hills mansion, although court filings do not indicate whether that raid took place.*** They also monitored him walking his dogs by the property last year.

***In a November affidavit outlining the investigation, a special agent for the FBI focusing on complex financial crimes alleged that Wiederhorn, 56, had "devised and executed a fraudulent scheme" to avoid paying taxes and received "millions of dollars in sham loans" through his companies.***

The affidavit identifies years of credit card purchases by Wiederhorn, his children, and other relatives — $183,500 at a London jeweler; $150,000 apparently for a down payment on a Rolls-Royce; more than $100,000 to a Beverly Hills divorce attorney — and alleges they were "paid primarily" out of accounts held by an affiliate of the publicly traded FAT Brands.

The filing also alleges that Wiederhorn generated millions of American Express rewards points by routing company money through his son's PayPal account.

***The agent concluded there was probable cause that Wiederhorn "engaged in the following criminal conduct," including tax offenses, misrepresentations to investors, and fraud offenses "relating to personal expenses that Wiederhorn caused FAT ... to pay."***

*  *  *

> The FBI agent also outlined how he believes Wiederhorn "converted" money from FAT Brands and its affiliates via credit cards that show purchases at Dolce & Gabbana, Giorgio Armani and Restoration Hardware.
>
> One of Wiederhorn's cards had subaccounts for credit cards issued to his six children, his mother, personal household employees, his ex-wife and others. Their charges include "significant expenses, which appear to be personal in nature," such as doctor bills, clothing, shoes, mattresses, groceries, tutoring services and pet care.
>
> ***From October 2017 — the date of FAT Brands' initial public offering — to May 2019, about $5 million from the company or its subsidiaries went to cover various Wiederhorn credit card balances, according to the court filing.***
>
> Thayer Wiederhorn, an executive at FAT Brands, is referenced specifically in connection with an alleged scheme to route millions of dollars of company money through American Express charges to a PayPal account bearing his name. The FBI agent suggests the apparent goal was to generate credit card rewards points for his father.
>
> The court records describe the scheme as "round-trip transactions," with money traveling from the younger Wiederhorn's PayPal account, to his personal Bank of America accounts, and back to FAT or its subsidiaries.
>
> The FBI agent tabulated a cost more than $250,000 in fees to PayPal out of about $9 million that traveled "round trip."

> Those $250,000 in fees were spent "for no legitimate corporate purpose," the FBI agent wrote, but "to further Wiederhorn's fraudulent scheme."
>
> (Emphasis added.)

152. On February 22, 2022[1], before trading hours, the Company filed a current report with the SEC on Form 8-K, in which the Company disclosed the following, in relevant part:

> … the U.S. Attorney's Office for the Central District of California (the "U.S. Attorney") and the U.S. Securities and Exchange Commission informed the Company in December 2021 that they have opened investigations relating to the Company and our Chief Executive Officer, Andrew Wiederhorn, and are formally seeking documents and materials concerning, among other things, the Company's December 2020 merger with Fog Cutter Capital Group Inc., transactions between these entities and Mr. Wiederhorn, and compensation, extensions of credit and other benefits or payments received by Mr. Wiederhorn or his family.

153. These disclosures brought to light Wiederhorn's latest schemes to use FAT Brands as his own private piggy bank, misappropriating funds for his and his family's own use.

154. Specifically, the *LA Times* Article and the February 22, 2022 8-K revealed to investors for the first time that: (1) Andrew Wiederhorn devised and executed a fraudulent scheme to receive millions of dollars in sham loans through FAT Brands and FCCG; (2) Andrew Wiederhorn caused FAT Brands to pay for at

---

[1] On February 21, 2022, the market was closed in observance of President's Day.

least $5 million of personal expenses for him and his family, including between October 2017 and May 2019; (3) Andrew Wiederhorn and his son, Thayer Wiederhorn, misused corporate funds in "roundtrip" transactions to fraudulently generate credit card rewards points for Andrew Wiederhorn's personal benefit; and (4) none of these actions were carried out for any legitimate corporate purpose.

155. These disclosures also revealed to investors for the first time facts demonstrating that FAT Brands had engaged in undisclosed material related-party transactions (*i.e.*, the payments for Andrew Wiederhorn's personal credit card expenses and round-tripping Company funds to generate credit card rewards points for Andrew Wiederhorn), and that the Company failed to disclose material weakness in its internal controls over financial reporting relating to the ability to identify and report fraudulent or self-dealing transactions by Company executives, namely Wiederhorn.

156. The *LA Times* Article in particular revealed not merely the existence of an investigation into *potential* misconduct, but that an FBI agent concluded in a sworn affidavit filed with the court in support of a search warrant, that "***there was probable cause*** that Wiederhorn 'engaged in the following criminal conduct,' including tax offenses, misrepresentations to investors, and fraud offenses 'relating to personal expenses that Wiederhorn caused FAT ... to pay.'" Although the documents remain sealed at this time, the fact that a raid of Thayer Wiederhorn's house (and possibly Andrew Wiederhorn's house as well) was conducted implies that the search warrant application was granted, upon the court's determination that the FBI's evidence was sufficient to establish probable cause.

157. On this news, FAT Brands' class A common stock price fell $2.42 per share, or 23%, to close at $8.14 per share on February 22, 2022, on unusually heavy trading volume, damaging investors.

158. On this news, FAT Brands' class B common stock price fell $1.83 per share, or 17%, to close at $8.89 per share on February 22, 2022, on unusually heavy trading volume, damaging investors.

159. On this news, FAT Brands' preferred stock price fell $5.36 per share, or 30%, to close at 12.37 per share on February 22, 2022, on unusually heavy trading volume, damaging investors.

160. On this news FAT Brands' warrants' price fell $2.41, or 35%, to close at $4.47 per warrant on February 22, 2022, on unusually heavy trading volume, damaging investors.

161. As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

162. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased publicly traded FAT Brands securities during the Class Period and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants and the officers and directors of the Company at all relevant times, members of their immediate families and legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

163. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class, and that they are geographically dispersed. Record owners and

other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

164. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

165. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

166. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the Exchange Act;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of the Company's securities when the truth was revealed and, if so, what is the proper measure of damages.

167. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

168. Plaintiffs and the Class will rely, in part, upon the presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market doctrine because the Company's securities traded in efficient markets during the Class Period, in that, among other things:

(a) Defendants made public misrepresentations of, or failed to disclose, material facts during the Class Period;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC;

(c) The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

(d) The Company's securities were liquid and traded with moderate to heavy volume during the Class Period. On average, 290,000 shares of the Company's Class A common stock and 1.1 million shares of the Company's Class B common stock, or approximately 2.4% and 86%

respectively, of the Company's total shares outstanding, were traded weekly, permitting a very strong presumption that the shares traded on an efficient market;

(e) The Company traded on NASDAQ, and was covered by multiple analysts;

(f) The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

169. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

170. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

# CLAIMS FOR RELIEF

## COUNT I
## Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against The Company and the Officer Defendants

171. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

172. This Count is asserted against the Company and the Officer Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

173. During the Class Period, the Company and the Officer Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

174. The Company and the Officer Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

175. The Company and the Officer Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public;

and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The Company and the Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of the Company's allegedly false and misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

176. The Officer Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

177. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. Unaware of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of The Company's and the Officer Defendants' false and misleading statements.

178. Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially inflated by The Company's and the Officer Defendants' false and misleading statements and by the material adverse information which The Company and the Officer Defendants did

not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

179. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

180. By reason of the foregoing, The Company and the Officer Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for the substantial damages they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

181. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

182. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. In carrying out the duties and responsibilities of their senior positions, they knew or recklessly disregarded the undisclosed material facts alleged above, the misrepresentation or omission of which rendered the challenged statements false and misleading.

183. As officers and directors of the Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

184. Due to their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company

disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

185. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein, which artificially inflated the market price of the Company's securities during the Class Period.

186. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiffs as class representatives and Plaintiffs' counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and expert fees; and

D. Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: June 27, 2022

**THE ROSEN LAW FIRM, P.A.**


*/s/Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim*
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

Joshua Baker (*pro hac vice* application pending)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jbaker@rosenlegal.com

**pro hac vice* application forthcoming

*Lead Counsel for Plaintiffs*

**POMERANTZ LLP**
Jeremy Lieberman*
Brenda Szydlo*
600 Third Avenue, 20th Floor
New York, NY 10016

Telephone: (646) 581-9996
Email: jlieberman@pomlaw.com
bszydlo@pomlaw.com

**pro hac vice* application forthcoming

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows: I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071. I am over the age of eighteen.

On June 27, 2022, I electronically filed the foregoing CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on June 27, 2022.

*/s/Laurence M .Rosen*